**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROOSEVELT MOORE,

        Plaintiff,                        Case No. 05-74306

vs.

                                         HONORABLE NANCY G. EDMUNDS
                                         HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.     BACKGROUND**

Roosevelt Moore brought this action under 42 U.S.C. §§ 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).  For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

**A.     Procedural History**

Plaintiff applied for DIB on April 4, 2002, alleging he was disabled as of November 21, 2001, as a result of back pain, headaches and various mental impairments (R. 46, 53).  On November 19, 2002, Plaintiff's application was denied (R. 29-32).  A hearing was held before Administrative Law Judge ("ALJ") Gilbert A. Sheard on September 15, 2004 (R. 16-22).

Plaintiff was represented by counsel, Mikel E. Lupisella and Richard Dowel.  Vocational Expert ("VE") Judith Findora also testified.

ALJ Sheard issued a January 28, 2005, decision finding Plaintiff not entitled to a period of disability (R. 16, 22).  On September 21, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.

**B.**     **Background Facts**

In Plaintiff's application he states that he first began experiencing ailments in 1999, and was unable to work starting November 21, 2001, due to back pain, headaches and mental disorders  (R. 53).  In his *Pain Questionnaire* Plaintiff indicated that the pain starts in the middle of his back and moves down into his legs.  Pain is almost constantly present and inhibits Plaintiff's ability to walk and stand.  Extended standing increases the pain.  Resting and sitting helps to alleviate the pain.  Plaintiff also has difficulty sleeping due to "emotional problems" (R. 67).  He reports that he has been prescribed Zyprexon, Wellbutrin, and Trimox, which help with his symptoms within three to four hours (R. 67).  The medications cause drowsiness, and prevent him from driving.

Plaintiff was 55 years old on the date of the ALJ's decision (R. 21).  He completed high school (R. 59), and has prior work experience as a truck driver and laborer (R. 56).

*1.*     *Plaintiff's Hearing Testimony and Statements*

Plaintiff testified that he suffers from depression (R. 266).  He stopped seeing his psychiatrist approximately three or four months ago because the medication his doctor proscribed caused him to sleep constantly (R. 267).  Without the medication, however, he has difficulty sleeping, often waking after two or three hours.  He has low energy and takes naps

daily that vary in length (R. 268). Plaintiff indicated his intention to follow-up with his psychiatrist.

Plaintiff has difficulty going out in public. He does not like crowds and prefers to stay at home. Yet, he attends church approximately twice a month (R. 267). Memory problems prevent him from staying focused long enough to complete tasks and contribute to his difficulty in keeping a job. He relies on his wife heavily and indicated she shops for groceries and pays the bills. In response to questions from ALJ Sheard, Plaintiff testified that his wife would remind him to go to work, "but I just – like I say, I'm on engine level, I don't be – I want to go but I don't want to go. It's just – I've never been like this before in my life. I, I worked a long time, hard work. But I just can't – I don't know, I just can't" (R. 272).

Plaintiff stated that he previously worked as a driver delivering "water and stuff" (R. 273). He was fired because he did not go to work. Plaintiff indicated that he had an alarm clock that he used to remind him to go to work, but he would turn it off on days he did not feel well. Plaintiff testified further that he does not like to drive because of his dislike of traffic. He has friends drive him to AA meetings and other events. He may drive approximately two blocks from his home, but he does not drive on expressways (R. 274).

Plaintiff testified that he stopped drinking and using illegal drugs approximately nine or ten months before the date of the hearing (R. 265), and attends Alcoholics Anonymous ("AA") classes at least three or four times a week (R. 266). His wife also counsels him on his drug and alcohol problems. In May 2003 he suffered a relapse when he stopped attending AA meetings. He reported that he felt "like suicidal -- homicidal, whatever" (R. 269).

Plaintiff has pain in his lower back (R. 270). The pain radiates into his legs and requires

him to sit occasionally because of its intensity. Extended standing and lifting heavy objects increases the pain. Taking Advil and using a heat pad helps to alleviate the pain (R. 271). The medication upsets his stomach and increases the amount of times he uses the restroom. As of the time of the hearing, Plaintiff was not receiving medical care for his back pain.

*2.     Medical Evidence*

In July 2001 Plaintiff was admitted to the hospital pursuant to a court order based on his history of cocaine abuse and drinking (R. 118). Plaintiff denied suicidal ideation, and exhibited grossly organized thinking, intact memory and denied auditory or visual hallucinations (R. 118-19). He was diagnosed with a single episode of major depression, adjustment disorder with depression and substance abuse dependence. Plaintiff was assigned a GAF score of 30, indicating behavior influenced by delusions or hallucinations; or serious impairment in communication or judgment; or inability to function in almost all areas (R. 119). *See* DSM-IV at 34.[1] Plaintiff was prescribed Wellbutrin and Desyrel for his depression and sleeping problems (R. 119). When discharged from the hospital a few days later, his treating psychiatrist, C.A.N. Rao, M.D., assigned him a GAF score of 55, indicating moderate symptoms (flat affect,

---

[1] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

occasional panic attacks) or moderate difficulty in social, occupational or social functioning (such as few friends, or inability to keep a job) (R. 171). *See* DSM-IV at 34.

In August 2001 Plaintiff's family physician, Harpal Singh, M.D., reported that Plaintiff complained of reduced strength, pain and difficulty in sitting and standing for prolonged periods (R. 109). Dr. Singh opined that Plaintiff would benefit from therapy. The remainder of Dr. Singh's notes record Plaintiff's regular requests for refills of his Viagra prescription (R. 100-01). A chest X-ray taken in March 2002 was characterized as normal (R. 110).

In August of 2002 Plaintiff underwent a consultative examination performed by Siva Sankaran, M.D. Plaintiff complained of back pain when walking more than one mile or repeated lifting and bending (R. 120). He also complained of headaches and difficulty sleeping (R. 121). Upon examination, Dr. Sankaran observed that Plaintiff had normal neurological function and reflexes, was able to walk, had negative straight leg raising, no problems using his hands and no muscle atrophy (R. 122). The doctor concluded that Plaintiff suffered from major depression, for which he treated with a psychiatrist, and that he had arthritis of the lumbar spine which caused minimal decrease in range of motion (R. 123).

In September 2002 Plaintiff underwent a consultative psychiatric examination, performed by Margaret Cappone, Ph.D. Dr. Cappone observed that Plaintiff was in contact with reality, had fair insight, exhibited well organized and logical thinking and claimed to suffer visual and auditory hallucinations (R. 131). Dr. Cappone concluded that Plaintiff's cocaine addiction was in "Sustained Full Remission, by report, since July, 2001" and that he suffered from a Dysthymic Disorder (R. 134). She assigned him a GAF score of 65, indicating mild symptoms (depressed mood or insomnia) or some difficulty in social, occupational, or school

functioning (R. 134).  *See* DSM-IV at 34.

In September 2002 Plaintiff's medical records were reviewed by Sally Kline, a state consultative medical examiner (R. 137- 43).  She found that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds.  Further, Plaintiff could sit, stand and walk for six hours a day, engage in unlimited pushing and pulling, and posturally was limited only to occasional stooping.

In October 2002 Plaintiff's memory was tested by Dr. Cappone. She noted that Plaintiff exhibited variable effort, exaggerated his sleepiness and pretended to be asleep, and that nothing in his past testing had indicated a problem with memory function (R. 145).  Dr. Cappone opined that Plaintiff's poor performance reflected an underestimation of his overall memory abilities She again assigned Plaintiff a GAF score of 65 (R. 147).

In November 2002 a review of Plaintiff's psychiatric record was performed by Ronald Marshall, Ph.D., a state medical consultant.  Dr. Marshall noted that Plaintiff had a cocaine dependency, which was in remission (R. 158).  He indicated that Plaintiff had an affective disorder, but did not indicate any degree of functional limitation (R. 153, 160-61).  Dr. Marshall also performed a mental capacity assessment at that time, and found that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual; and in his ability to accept instructions and respond appropriately to criticism from supervisors (R. 164-65).  Dr. Marshall found that Plaintiff was "not significantly limited" in all other respects (R. 164-65).

In February 2003 Plaintiff suffered an attack of dizziness, and was treated in the ER.

Plaintiff's systems were normal upon examination, as were all preliminary lab results. His dizzy spell was diagnosed as "Vertigo of uncertain etiology" (R. 177). Plaintiff was referred for a chest X-ray at that time, as well as a CT scan of his head. Both tests were normal (R. 174, 175).

In May 2003 Plaintiff went to the hospital and complained of chest pain, caused by what he thought was crack cocaine (R. 195). Plaintiff indicated that sublingual nitroglycerin relieved his pain. He was admitted to the chest pain center to rule out a potential heart attack (R. 196).

In June 2003 Dr. Rao, Plaintiff's psychiatrist, issued a letter indicating that Plaintiff had not been regular in his appointments, and had only been seen four times in 2003 (R. 169). Dr. Rao indicated that Plaintiff had been prescribed Zyprexa, used to treat bipolar disorder; Klonopin, an anti-anxiety drug; and Effexor, an anti-depressant (R. 169).

An undated and unsigned functional capacity assessment was also provided (Exhibit 9-E referred to below), indicating that Plaintiff: could not understand, remember, or carry out detailed or complex job instructions; was limited to routine and repetitive work; could not work in a job that was closely and intensely supervised; could not work at a job which would be a serious challenge given his education and work background; could not perform complex or abstract work; and could not work around unprotected heights, dangerous moving machinery, automotive equipment, ladders, open water, and open flames (R. 87-88). This assessment also provided that Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual was "impaired but not precluded." Finally, the assessment incorporated limitations in the above noted September 2002 physical capacity assessment provided by state medical reviewers (R. 136-43).

7

### 3. *Vocational Expert's Testimony*

ALJ Sheard asked VE Findora to consider a hypothetical person "with the limitations set out in Exhibit 9-E" (R. 276.)  Specifically, the ALJ stated: "I'll fill the RFC again.  Uh-huh.  It will be 9-E...Here it has the state agency's RFC" (R. 275).  In response, VE Findora stated that a hypothetical person of Plaintiff's age, education and work background with the residual functional capacity set out in Exhibit 9-E could fill the following regional jobs at the medium level: 84,000 janitor positions, 11,000 housekeeper positions and 20,000 stock handler positions (R. 277).  VE Findora indicated she had cut down the number of stock handler positions to reflect those where the worker stayed on the floor due to Plaintiff's fear of heights (R. 278).  Further, she stated that all of the employers and jobs named permit the limitations described in the ALJ's hypothetical.

Plaintiff's counsel asked VE Findora to take into account an individual that "needed to nap one to two times during the day, anywhere from 30 minutes to an hour each during normal working hours, not during the normal breaks" (R. 279).  VE Findora testified that this would preclude employment.

### 4. *The ALJ's Decision*

ALJ Sheard found that Plaintiff was not under a disability as defined in the Social Security Act at any time through the date of his decision (R. 22).  He opined that Plaintiff met the disability insured requirements of the Act at least through November 21, 2001, and that he had not engaged in substantial gainful activity since the alleged onset of disability, November 21, 2001 (R. 21).  Further, ALJ Sheard indicated that the objective medical evidence supported that Plaintiff has severe physical impairments due to degenerative arthritis causing pain in the

lower back, and severe psychological impairment due to dysthymia.  Yet, Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of any impairment listed in Appendix 1, Subpart P, Part 404 (the "Listing").

The ALJ found that Plaintiff retained a residual functional capacity for a full range of work, with only the following limitations: he cannot understand, remember and carry out complex or detailed job instructions; due to difficulties maintaining attention and concentration for extended periods, his job must be routine and repetitive; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is impaired but not precluded; he cannot have a job which is normally closely and intensely supervised after he first learns the job; his job must follow the limits set out in Exhibit 6F; due to his low esteem and lack of confidence, he cannot have a job which would be a serious challenge to a person with his education and vocational background; do not give him complex or abstract work; keep him away from unprotected heights, dangerous moving machinery, automotive equipment, ladder, open water and flame; and he should avoid crowds as set out in Exhibit 9E (R. 20).  ALJ Sheard concluded that Plaintiff does not have any transferable skills that can be used for work within his residual functional capacity.

ALJ Sheard found Plaintiff's allegations of pain and dysfunction not fully credible and inconsistent with the evidence of record (R. 18).  In particular, the ALJ indicated that Plaintiff initially stated that he missed work because he forgot to go, but later changed his answer indicating that he did not go to work because of a low energy level.  ALJ Sheard felt this variance in response undercut Plaintiff's "entire credibility as a witness" (R. 19).  Further, the ALJ noted that Dr. Cappone reported that Plaintiff gave a variable and poor effort during his

psychological exam, resulting in an underestimation of Plaintiff's current memory abilities. Yet, ALJ Sheard did give Plaintiff's testimony some benefit and indicated that Plaintiff's statements as they regarded heights, crowds, his less than average memory, dangerous moving machinery, automotive equipment, ladders, open water and open flame should be taken into account.

While medical evidence documented the presence of impairments, ALJ Sheard did not believe that the intensity, persistence and functionality limiting effects of Plaintiff's symptoms were consistent with the medical record. Specifically, he found the record does not indicate that Plaintiff has lost the ability to ambulate effectively, "nor that he has lost the use of his hands and arms for gross and fine manipulation" (R. 17). ALJ Sheard also did not find Plaintiff's diabetes to be severe and concluded that this impairment did not make any substantial difference in his ability to work. Further, despite complaints of breathing difficulty and chest pains, his medical records show good breathing values and a normal chest (R. 18).

The ALJ also examined the Plaintiff's record of psychological impairments, but discounted certain claims. In particular, as discussed above, the ALJ noted that Plaintiff gave poor effort during his psychological evaluation performed by Margaret Cappone, Ph.D. Further, while Siva Sankaran, M.D. diagnosed Plaintiff with major depression, ALJ Sheard did not give this diagnosis any weight because Dr. Sankaran is not a psychiatrist.

ALJ Sheard noted that Plaintiff has a history of drug and alcohol abuse, currently reported to be in remission. Yet, he indicated that nothing in his drug and alcohol abuse history show a "material contributing factor to his current physical or mental difficulties" (R. 19).

**II.    ANALYSIS**

    **A.    Standards Of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Secretary of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists that the Plaintiff can perform.

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B.  Factual Analysis

Plaintiff raises two challenges to the Commissioner's decision: (1) ALJ Sheard did not present the VE with an accurate hypothetical question because he failed to properly take into account Plaintiff's postural limitations; (2) ALJ Sheard did not present the VE with an accurate hypothetical question because he failed to properly take into account Plaintiff's mental limitations.

#### 1.  *Plaintiff's Postural Limitations*

The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir.1999).  To meet the burden of showing that Plaintiff could perform work that is available in the national economy, the Commissioner must make a finding "supported by substantial evidence that [he] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir.1987).  This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [his] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ erred by asking the VE to consider a hypothetical person with the mental limitations provided in Exhibit 9-E, without referencing the physical limitations indicated in Exhibit 6-F, the September 2002 state agency physical capacity assessment.  Exhibit 6-F provided that Plaintiff could perform medium work, limited to occasional stooping.  Plaintiff contends that the ALJ failed to include this stooping restriction, and as a result the VE did not take into account all of Plaintiff's limitations when citing available

positions.

Yet, the ALJ did provide all of Plaintiff's physical limitations to the VE. Specifically, he asked the VE to consider a hypothetical person "with the limitations set out in Exhibit 9-E" (R. 276), which indicated applicable limitations by use of check marks (R. 87-88). At the bottom of the first page of Exhibit 9-E is a handwritten notation, which is also checked, stating Plaintiff "has the limitations of 6-F." Exhibit 9-E thus clearly included the September 2002 state agency physical capacity assessment limiting Plaintiff to occasional stooping, and was properly provided to the VE in the ALJ's hypothetical.

Moreover, ALJ Sheard explicitly indicated that the VE should incorporate the restrictions of Exhibit 6-F into her answers to his hypothetical. At the outset of ALJ Sheard's examination of the VE he stated: "I'll fill the RFC again. Uh-huh. It will be 9-E...Here it has the state agency's RFC" (R. 275). Therefore, in the presence of Plaintiff and his counsel, the ALJ specifically gave instructions for the VE to consider the state agency's RFC, including the limitation of occasional stopping. Plaintiff's argument is therefore without merit and it is recommended that ALJ Sheard's hypothetical question not be overturned as it regards any physical limitations.

### 2.    *Plaintiff's Mental Limitations*

Plaintiff argues that the ALJ's hypothetical to the VE was also flawed because one of the limitations set forth in Exhibit 9-E states Plaintiff's "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is impaired but not precluded" (R. 87). Plaintiff contends that this limitation is equivalent to the November 2002 state agency mental capacity assessment, where Dr. Marshall checked a box indicating that

Plaintiff was "moderately limited" in his abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (R. 164). Under the previously used evaluative scale, deficiencies in concentration, and other areas, were rated on a five-level range of frequency: never, seldom, often, frequent and constant. C.F.R. 404.1520a(c)(4) has since been amended to encompass a five-level scale based on severity rather than frequency of the limitation. The current scale rates severity as none, mild, moderate, marked and extreme. Thus, Plaintiff contends a diagnosis of "moderately limited" is equivalent to "often," and under *Bankston v. Comm'r of Soc. Sec.*, 127 F. Supp. 2d 820 (E.D.Mich. 2000), such a limitation necessarily requires a finding that a claimant is disabled.

In *Bankston*, the Court noted that it was reasonable to conclude under the regulations "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." *Id.* at 826. The Court then determined that under the relevant portion of the PRTF, "often" should logically be defined as fifty percent of the time. *Id*. at 827. There, the finding that the claimant "often" had deficiencies of concentration, paired with the uncontested findings of the treating physician that he was disabled, resulted in a judgment of disability and a remand for award of benefits.

Yet, the Sixth Circuit has since held that an ALJ's failure to include in a hypothetical question a PRTF finding that a claimant "often" has difficulty concentrating is not a basis for remand when the hypothetical question adequately describes that claimant's limitations arising from a mental impairment. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). In *Smith*, the ALJ marked on the PRTF that Smith "often" suffered deficiencies of concentration, persistence or pace, but did not include that finding in the hypothetical question to the VE. Smith, relying

14

on cases similar to *Bankston*, argued for a remand based on that omission. The Sixth Circuit, without citing *Bankston,* held that the hypothetical question asked by the ALJ was adequate. The court noted that while the ALJ checked a single box in a 1-5 rating scale on a standard psychiatric assessment form

> the ALJ went beyond this simple frequency assessment to develop a complete and accurate assessment of Smith's mental impairment, as *Varley* requires. In particular, the ALJ relied on the testimony of four physicians who characterized Smith's concentration problems as minimal or negligible. The ALJ then translated Smith's condition into the only concrete restrictions available to him–examining psychiatrist Schweid's recommended restrictions against quotas, complexity, stress, etc.– and duly incorporated them into his hypothetical to the vocational expert

*Id.* at 379.

The Court distinguished several unpublished district court cases similar to *Bankston* because the ALJ's in those cases did not include in the hypothetical question the finding that the claimant "often" had difficulty concentrating, nor did they otherwise account for such a limitation. *Id.* Thus, when the ALJ makes a PRTF finding that the claimant "often" has problems with concentration, but does not specifically include that limitation in the hypothetical question, the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations.

Here, while the ALJ did not specifically include Dr. Marshall's finding that Plaintiff is "moderately limited," he did indicate Plaintiff was "impaired." Moreover, more importantly, ALJ Sheard went beyond this "simple frequency assessment to develop a complete and accurate assessment" of Plaintiff's mental impairments. *Id.* He developed a mental RFC that limited Plaintiff to jobs involving limited contact with supervisors, no abstract or complex work, simple and routine tasks that were within his educational and work background and restricted work

15

around crowds. Further, the ALJ directly addressed and discounted many of Plaintiff's claims of physiological impairments. He noted that Plaintiff gave poor effort during his psychological evaluation performed by Margaret Cappone, Ph.D and therefore his mental abilities were underestimated. In addition, while Plaintiff was diagnosed with major depression, ALJ Sheard did not give this diagnosis any weight because the evaluating physician, Dr. Sankaran, is not a psychiatrist.

Having incorporated all of Plaintiff's mental limitations into his RFC assessment, the ALJ's hypothetical question was adequate.[3] Therefore, it is recommended that ALJ Sheard's hypothetical question not be overturned, and his decision upheld.

### III.  RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and

---

[3] While it would have been better to have added a restriction on quotas as was done in *Smith v. Halter*, the janitor, housekeeping and stock handler positions identified by VE Findora are not likely to involve quotas as inspections, assembly and packaging jobs would.

Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: October 31, 2006                                                           s/Steven D. Pepe
Ann Arbor, Michigan                                                                United States Magistrate Judge


Certificate of Service

I hereby certify that copies of this Report and Recommendation were served upon the attorneys of record by electronic means or U. S. Mail on October 31, 2006.

s/Deadrea Eldridge
Courtroom Deputy Clerk